```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------- x
UNITED STATES OF AMERICA,        :
                                 :
        - against -              :         97-CR-1105(LAP)
                                 :
MICHAEL MUNGIN,                  :
                                 :
                Defendant.       :
---------------------------------x
```

LORETTA A. PRESKA, SENIOR UNITED STATES DISTRICT JUDGE:

Before the Court is Defendant Michael Mungin's motion for compassionate release pursuant the 18 U.S.C. section 3582(c). (Dkt. no. 255). For the reasons set out below, the motion is denied.

I.  **Background**

**A. The Offense Conduct, Guilty Plea, and Sentencing**

From 1989 to 1997, the Defendant was a member of "Tito's Crew," a violent drug-trafficking organization that operated in upper Manhattan and was led by Jose Erbo, also known as "Tito." (PSR ¶¶ 30, 33). As a member of Tito's Crew, the Defendant acted as a paid killer, receiving tens of thousands of dollars for participating in three murders and an attempted murder over a span of six years.

On August 11, 1992, while in the vicinity of 181st Street and Amsterdam Avenue in Manhattan, Erbo saw Epifiano Delacruz, who was an associate of a rival drug dealer. (Id. ¶ 34). He called the Defendant, asking the Defendant to come to the area. (Id.). When the Defendant arrived, Erbo pointed out Delacruz and told the Defendant to shoot him. (Id.). The Defendant followed orders: He approached Delacruz and shot him six times. (Id.). Delacruz survived, but Erbo paid the Defendant approximately $10,000 for his role in the attempted murder. (Id.).

Eight months later, on April 8, 1993, Erbo again called on the Defendant to execute a hit. This time, Erbo and the Defendant were on a motorcycle in the vicinity of 135th Street and Broadway in Manhattan, when Erbo spotted Rafael Abrue--whom Erbo believed was an informant--near a coffee shop. (Id. ¶ 36). Erbo instructed the Defendant to shoot Abrue, and the Defendant again complied, killing Abrue by shooting him five times. (Id.). Erbo paid the Defendant approximately $8,000 for committing the murder. (Id.).

The Defendant's next murder came in 1994. In March of that year, Erbo had agreed to help one of his cocaine suppliers kill Nelson Almonte, whom the supplier believed was passing information to the Drug Enforcement Administration. (Id. ¶ 37). On April 22, the supplier spotted Almonte in the vicinity of

2

191st Street and Wadsworth Terrace and paged Erbo, who in turn paged the Defendant. (Id.). When the Defendant arrived, he and Erbo followed Almonte via motorcycle as he drove through Manhattan. (Id.). As the motorcycle pulled up to Almonte's car, the Defendant fired approximately 11 bullets at the vehicle, killing Almonte and seriously injuring three other passengers. (Id.). Erbo paid the Defendant several thousand dollars for his role in the murder. (Id.).

Finally, in April 1997, Erbo accepted a contract to murder an individual named Carlos Correa. (Id. ¶ 40). Once again, Erbo turned to the Defendant for assistance, directing the Defendant to carry out the killing. (Id.). The Defendant located Correa on April 7, and shot him five times, killing him. (Id. ¶ 41). The Defendant again received several thousand dollars for the murder. (Id.).

On November 19, 1999, the Defendant was charged in a four-count Information, S6 97 Cr. 1105. Counts One through Four charged the Defendant with committing violent crimes in aid of racketeering, in violation of Title 18, United States Code, Sections 1959(a)(5) and 2, by attempting to murder Epifiano Delacruz and conspiring to murder Rafael Abrue, Nelson Almonte, and Carlos Correa.

3

The Defendant pled guilty to all four counts of the Information on November 19, 1999, pursuant to a plea agreement. Under that agreement, the parties stipulated to an offense level of 43 and that the Defendant was in Criminal History Category III. Based on those calculations, the applicable Guidelines range would have been life imprisonment. But because the statutory maximum term of incarceration for the charged offenses was 40 years imprisonment, the agreement calculated the Defendant's stipulated Guidelines range as 40 years imprisonment. On June 8, 2000, the District Court sentenced the Defendant to the statutory maximum sentence of 480 months imprisonment, to be followed by three years supervised release.

**B. The Home Confinement and Release Requests**

The Defendant has over 12 years remaining on his sentence, with a projected release date of March 26, 2033. He is currently incarcerated at FCI Fort Dix, which is "a low security federal correctional institution with an adjacent minimum security satellite camp." See Fort Dix BOP Website.[1]  Fort Dix is thus two separate (although adjacent) institutions, referred to herein as "Fort Dix Low" and "Fort Dix Camp."

---

[1] Available at https://www.bop.gov/locations/institutions/ftd/.

The Defendant is incarcerated in Fort Dix Low. According to the Government, as of May 18, 2020, the Bureau of Prisons has confirmed that no inmates at Fort Dix Low have tested positive for COVID-19. (Government Letter dated May 19, 2020 (dkt.no. 257) at 2).

The separate institution, Fort Dix Camp, has had 59 cases of the virus among inmates, 27 of whom have been transferred to the recovery floor after being asymptomatic for 10 days.  (Id.)

On April 23, 2020, the Defendant filed a motion with the Bureau of Prisons ("BOP"), requesting temporary transfer to home confinement until the end of the pandemic or, in the alternative, compassionate release. The Defendant argued that, compared to others, he was at a significantly greater risk of suffering from COVID-19 because he is 55 years old and suffers from prostate cancer. On May 6, 2020, the Defendant filed an amended request for compassionate release or temporary release to home incarceration.[2] The BOP has not yet issued a decision on his motion.

---

[2] There is no statute that authorizes either the BOP or this Court to grant temporary home confinement. Under 18 U.S.C. § 3624(c), the BOP has the authority to direct that a prisoner "spends a portion of the final months of [a prison] term" in home confinement. But that provision does not authorize temporary home confinement, nor does it authorize judicial review of the BOP's decision.

**II.  Applicable Law**

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, a court "may not modify a term of imprisonment once it has been imposed except" that:

> [T]he court, . . . upon motion of the Defendant after the Defendant has fully exhausted all administrative rights to appeal a failure by the Bureau of Prisons to bring a motion on the Defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the Defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission ...

The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13. That section provides that a court may reduce a term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id., § 1B1.13(3).

With respect to the "extraordinary and compelling reasons" requirement, the application notes to Guidelines Section 1B1.13

6

provide three instances where such reasons exist: (A) the Defendant has a terminal illness or serious medical condition that substantially diminishes his ability care for himself; (B) the Defendant is, at least 65 years old, has served 10 years or 75 percent of his sentence, and is experiencing a serious age-related decline in health; or (C) the Defendant's family circumstances have changed such that the Defendant is the only available caregiver for a minor child or incapacitated spouse. U.S.S.G. § 1B1.13 app. note 1(A)-(C). The application notes also allow a catchall condition where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the Defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Id. at app. note 1(D).

### III. Discussion

The Court assumes without deciding that it has the power to decide the motion despite Defendant's failure to exhaust his administrative remedies.

First, Defendant has not carried his burden of demonstrating compelling and extraordinary circumstances compelling his release.  He has not demonstrated that he comes within any of the criteria prescribed by application note 1(A)-

7

(C) to section 1B1.13(1)(A):  he does not suggest that he has a terminal illness or serious condition that substantially diminishes his ability to care for himself; he is 55, well under the 65-year-old cut-off; and he does not suggest any family circumstance that demands that he care for a loved one.

While COVID-19 might present an extraordinary and compelling case for release for some inmates, this Defendant has not demonstrated that he is one of them.  As noted above, he is 55 years old, some ten years below the age that the CDC considers a person to be at high risk for the virus.

Defendant states that he is pre-diabetic and that he suffers from prostate cancer.  The Government reports the following information from Mr. Mungin's medical records:

- **Prediabetes:** According to the Defendant's medical records, an A1C level greater than 6.4 is consistent with diabetes, and an A1C level of between 5.7 and 6.4 shows that a person is at increased risk of diabetes. The medical reports submitted by the Defendant show that he had A1C levels of 5.9 and 5.8 in 2015 and 2016, respectively. More recent records show that, in 2018, the Defendant attended diabetes counseling. He then tested slightly below the at-risk range in 2019 and 2020, with A1C levels of 5.6 and 5.5, respectively.
- **Prostate Cancer:** In May 2018, the Defendant underwent a biopsy, which revealed prostate cancer. The BOP treated the cancer with radiation and a form of hormone therapy. The Defendant finished his treatment in February 2019. During follow-up appointments in May and June 2019, doctors reported that he was "doing well." He is currently taking medication for remaining symptoms and making follow-up visits with his physicians.

8

(Government Letter dated May 19, 2020 (dkt.no. 257) at 10).

The CDC, however, does not list prediabetes as a risk factor for COVID-19, See CDC, "Groups at Higher Risk for Severe Illness," available at https://www.cdc.gov/coronavirus/2019 ncov/need-extra-precautions/groups-at-higher-risk.html#diabetes., and Defendant has not suggested that his A1C levels or his symptoms are moving toward full-on diabetes, which is a risk factor for the virus.

Similarly, while the CDC states that cancer treatment can result in immunocompromise that would increase the risk of the virus, id., Defendant apparently is not now undergoing any cancer treatments and has not suggested that any prior treatments have resulted in a current compromise to his immune system.

In any event, the Defendant's risk of being exposed to COVID-19 while at his prison facility is relatively low. As explained above, Fort Dix is made up of two adjacent, but separate facilities: Fort Dix Low and Fort Dix Camp. All confirmed cases of coronavirus at Fort Dix are among inmates at Fort Dix Camp. There have been no confirmed cases of coronavirus at Fort Dix Low, which is the facility where the Defendant is incarcerated.

Accordingly, Defendant has not demonstrated that COVID-19 constitutes an extraordinary and compelling reason for his release.

Second, even if Defendant had shown such reason, the danger to the community that he poses and the need to punish him for his offenses counsel against release.  As noted above, Defendant was, quite simply, a paid killer who committed three murders and attempted a fourth.  Perhaps as bad, he committed the murders on public streets putting bystanders in danger and, indeed, in one shooting, seriously injured three passengers who were in a car with the intended victim.  Release of a Defendant who has demonstrated such a callous disregard for human life would put the community at risk.

There is also a need for punishment in this instance.  This Defendant's guidelines range was life imprisonment, and Judge Baer sentenced him to the statutory maximum of 480 months imprisonment.  He still has some twelve years of that sentence to serve, and the need for just punishment for these heinous crimes requires that he serve it.

For the reasons set out above, Defendant's motion for compassionate release (dkt.no. 255) is denied.

SO ORDERED.

Dated:    New York, NY
          June 2 , 2020

_____
Loretta A. Preska
Senior United States District Judge