UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | |
|---|---|
| -against- | 97 CR 1105 (LAP) |
| MICHAEL MUNGIN, | OPINION AND ORDER |
| Defendant, | |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Michael Mungin's second motion for compassionate release, (see dkt. no. 318 ["Mot."]), the Government's opposition, (see dkt. no. 321 ["Gov't Opp."]), and Defendant's reply, (see dkt. no. 327). For the reasons set out below, the motion is denied.

**I. Background**

A. The Offense Conduct

From 1989 to 1997, Defendant was a member of "Tito's Crew"—a violent drug-trafficking organization that operated in upper Manhattan and was led by Jose Erbo, also known as "Tito." (See Gov't Opp. at 1.) As a member of Tito's Crew, Defendant acted as a paid killer, receiving tens of thousands of dollars for participating in three murders and an attempted murder over a span of approximately six years. (See id.)

The attempted murder took place on August 11, 1992. While standing in the vicinity of 181st Street and Amsterdam Avenue in

1

Manhattan, Erbo spotted Epifiano Delacruz, an associate of a rival drug dealer. (See id.) Erbo called Defendant, asking him to come to the area. (See id.) When Defendant arrived, Erbo pointed out Delacruz and told Defendant to shoot Delacruz. (See id.) Defendant followed orders: he approached Delacruz and shot him six times. (See id.) Delacruz survived, but Erbo paid Defendant approximately $10,000 for his role in the attempted murder. (See id.)

Eight months later, on April 8, 1993, Erbo again called on Defendant to execute a hit. (See id.) This time, Erbo and Defendant were on a motorcycle in the vicinity of 135th Street and Broadway in Manhattan, when Erbo caught sight of Rafael Abrue near a coffee shop. (See id.) Erbo believed Abrue was an informant and instructed Defendant to shoot Abrue. (See id.) Once again, Defendant readily complied, killing Abrue by shooting him five times. (See id.) Defendant received approximately $8,000 for committing the murder. (See id.)

Defendant's next murder took place in 1994. (See id. at 2.) In March of that year, Erbo had agreed to help one of his cocaine suppliers kill Nelson Almonte, whom the supplier believed was giving information to the Drug Enforcement Administration. (See id.) On April 22, 1994, the supplier found Almonte in the vicinity of 191st Street and Wadsworth Terrace in Manhattan. (See id.) The supplier paged Erbo, who in turn paged Defendant. (See id.) When Defendant arrived, he and Erbo followed Almonte via motorcycle as

2

he drove through Manhattan. (See id.) Eventually, they were able to pull their motorcycle up alongside Almonte's car, at which point Defendant fired approximately eleven bullets at the vehicle, killing Almonte and seriously wounding three other passengers. (See id.) Erbo paid Defendant several thousand dollars for the murder. (See id.)

Finally, in April 1997, Erbo accepted a contract to murder an individual named Carlos Correa. (See id.) Once again, Erbo turned to Defendant for assistance, directing Defendant to carry out the killing. (See id.) Defendant located Correa on April 7, 1997, and shot him five times, killing him. (See id.) Defendant again received several thousand dollars for the murder. (See id.)

### B. The Conviction and Collateral Attacks

On or about February 23, 1999, Defendant was arrested for his participation in Tito's Crew. On November 19, 1999, he pled guilty to a four-count Information, S6 97 Cr. 1105, pursuant to a written plea agreement. Counts One through Four charged him with committing violent crimes in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(5) and 2, by attempting to murder Epifiano Delacruz and conspiring to murder Rafael Abrue, Nelson Almonte, and Carlos Correa. (See id.) Under the terms of the plea agreement, the parties stipulated to an offense level of 43 and a Criminal History Category of III. The applicable Guidelines range would have been life imprisonment, but because the maximum term of incarceration

3

for the charged offenses was forty years imprisonment, the Guidelines range was capped at 480 months imprisonment. On June 8, 2000, the District Court sentenced Defendant to the statutory maximum sentence of 480 months imprisonment, to be followed by three years supervised release.

Since his sentencing, Defendant has filed repeated collateral attacks to his conviction. In 2001, he filed a petition, pursuant to 28 U.S.C. § 2255, seeking to vacate his conviction, which the District Court denied in January 2002. (See dkt. nos. 65, 68.) Defendant then filed a motion for relief from judgment, pursuant to Federal Rule of Criminal Procedure 60(b), which was denied in January 2004. (See dkt. nos. 95, 96.)

In March 2011, Defendant filed another collateral attack, this time moving, pursuant to 18 U.S.C. § 3582(c)(2), to challenge his sentence. His motion relied on Amendment 591 to the United States Sentencing Guidelines, which "require[d] that the initial selection of the offense guideline be based only on the statute (or offense) of conviction rather than on judicial findings of actual conduct . . . that will never be made by the jury." United States v. Rivera, 293 F.3d 584, 585 (2d Cir. 2002). Defendant argued that, under Amendment 591, the applicable offense level should have been 28, not 43, which would have resulted in a lower sentence. (See Dkt. no. 150 at 2-3.)

4

The Court denied the motion. (See id.) Amendment 591, the Court explained, "applies only to the choice of the appropriate offense guideline, not to the selection of the base offense level[] set forth by the guideline." (Id. at 2 (quoting United States v. Ferranti, 411 Fed. App'x 373, 375 (2d Cir. 2011)).) In Defendant's case, the Court began with the offense guideline for conspiring to commit murder under U.S.S.G. § 2A1.5, which had a base offense level of 28, as Defendant contended. (See id.) But that guideline had a cross-reference to U.S.S.G. § 2A1.1 if the offense resulted in the death of a victim, which cross-reference applied in Defendant's case and increased the base offense level to 43. (See id.) As a result, the Court concluded, the offense level of 43 applied to Defendant was proper under Amendment 591 because the Court started with the offense guideline for the offense of conviction and only used the higher base offense level from U.S.S.G. § 2A1.1 because of the cross reference. (See id. at 2-3.) The Court noted that an alternative reading of Amendment 591 "would largely nullify numerous cross references" in the Guidelines, which "the Commission clearly did not contemplate." (Id. at 3 (quoting United States v. Hurley, 374 F.3d 38, 40 (1st Cir. 2004)).) The Court of Appeals affirmed the decision. (See dkt. no. 167.)

C. The First Compassionate Release Motion

On May 7, 2020, at the height of the COVID-19 pandemic, Defendant moved for compassionate release, pursuant to 18 U.S.C. § 3582(c). (See dkt. no. 255.) He argued that early release was appropriate because prison officials at Fort Dix were unable to control the spread of COVID-19 and because Defendant was particularly susceptible to complications from the virus because he was prediabetic and had recently finished treatment for prostate cancer. (See id. at 1.) The Government opposed the motion, arguing that Defendant had failed to exhaust administrative remedies, had not shown an extraordinary and compelling reason for release, and had not shown that early release would be consistent with sentencing factors in 18 U.S.C. § 3553(a). (See dkt. no. 257 at 1, 11.)

The Court denied Defendant's request for compassionate release in a written opinion issued on June 2, 2020. (See dkt. 261.) The Court assumed, without deciding, that it had the power to decide Defendant's motion despite his failure to exhaust his administrative remedies, instead rejecting his application for two substantive reasons. (See id. at 7, 10.) First, this Court found that Defendant had failed to "carr[y] his burden of demonstrating extraordinary and compelling circumstances compelling his release." (Id. at 7.) He had not shown that he was at a high risk of suffering complications from COVID-19 and had not shown a high

6

risk of exposure to the virus at his facility. (See id. at 7-9.) Second, the Court found that, "even if Defendant had shown" a compelling reason for early release, "the danger to the community that he poses and the need to punish him for his offenses counsel against release." (Id. at 10.) With respect to dangerousness, Defendant "was, quite simply, a paid killer who committed three murders and attempted a fourth," all on "public streets." (Id.) As for the need for punishment, Defendant's "[G]uidelines range was life imprisonment," and, due to the statutory maximum, he received a lesser sentence of 480 months imprisonment. (Id.) The Court noted that Defendant "still ha[d] some twelve years of that sentence to serve, and the need for just punishment for [his] heinous crimes require[d] that he serve it." (Id.)

### D. The Second Compassionate Release Motion

Defendant is currently incarcerated at FCI Fort Dix. He is 58 years old and is currently scheduled for release on or about March 26, 2033.

On October 5, 2022, Defendant filed a pro se motion for compassionate release in this Court, pursuant to 18 U.S.C. § 3582(c). (See Mot.) The BOP is unaware of Defendant's filing a new request for compassionate release with the Warden of FCI Fort Dix before filing this petition. (See Gov't Opp. at 3-4.) In his new motion, Defendant argues that he should be granted early release because he has accepted responsibility for his crimes and

7

been rehabilitated, which makes continued incarceration unnecessary. (See Mot. at 7-10.) He also claims that the COVID-19 pandemic presents a continued risk to his health. (See id. at 11-13.) Finally, Defendant argues that early release is appropriate because, under Amendment 591, his sentence should have been lower and because other criminal defendants with murder convictions have received sentences under 40 years or been granted early release through compassionate release motions. (See id. at 20-25.)

## II. Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act of 2018, a court upon a defendant's motion may reduce his term of imprisonment

> after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

The First Step Act allows district courts "independently to determine what reasons, for purposes of compassionate release, are 'extraordinary and compelling.'" United States v. Brooker, 976 F.3d 228, 234 (2d Cir. 2020). However, the guidance provided by the policy statement added to U.S.S.G. § 1B1.13 effective under the November 1, 2023, amendments to the Guidelines "as to what constitutes extraordinary and compelling reasons now controls the

8

analysis of a compassionate release motion." United States v. Lopez, 2024 WL964593, at *2 (S.D.N.Y. Mar. 5, 2024). But the "existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court must release the defendant." United States v. Madoff, 465 F. Supp. 3d 343, 349 (S.D.N.Y. 2020). Even if a court finds that a defendant has established an extraordinary and compelling reason for a reduction in sentence, it still must then consider the Section 3553(a) factors. See 18 U.S.C. § 3582(c)(1)(A)(i). Those factors include the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to provide the defendant with needed medical care; and the need to avoid unwarranted disparities in sentences. See 18 U.S.C. § 3553(a).

As the movant, the Defendant bears the burden of proving that he is entitled to relief under 18 U.S.C. § 3582. See Madoff, 465 F. Supp. 3d at 349; see also United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."). Because the Defendant is pro se, his motion must be construed liberally and read as raising

the strongest arguments it suggests. See United States v. Pilcher, 950 F.3d 39, 44 (2d Cir. 2020).

**III. Discussion**

Defendant's motion for compassionate release is denied. As in his first motion, he has not demonstrated extraordinary and compelling reasons for early release, and, even if he identified such reasons, release would be inappropriate in light of the heinous nature of his crime and the length of his remaining term of imprisonment.

A. Defendant Has Not Established Extraordinary and Compelling Reasons For Compassionate Release

Defendant has not carried his burden of showing that there are "extraordinary and compelling reasons" for granting his request for early release. 18 U.S.C. § 3582(c)(1)(A); Butler, 970 F.2d at 1026 ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").

Defendant's argument that the COVID-19 pandemic presents a reason for release is also considerably less forceful than in his initial motion. At the time of his initial motion, Defendant did not have any health conditions that placed him at a heightened risk of significant complications from the disease, (see dkt. no. 261 at 8-9), and he does not now claim that there have been any material changes to his health since then. Indeed, Defendant now

10

has immunity to the virus that he previously lacked: he contracted and recovered from the virus in late 2020 and received two doses of the Pfizer vaccine in 2022. (See Gov't Opp. at 5.) Defendant's facility, too, is in a considerably better state with respect to the virus than at the time of his prior motion. As of December 2, 2022, FCI Fort Dix had only one active case among inmates and five among staff and was operating with only moderate modifications to normal operations, rather than under full COVID-19 protocols. (See id.) Accordingly, Defendant has not demonstrated that COVID-19 constitutes an extraordinary and compelling reason for his release.

The Court also finds unpersuasive Defendant's claims that his original sentence was incorrect under Amendment 591 and that early release is required to prevent unwarranted sentencing disparities. The District Court and Court of Appeals have already rejected Defendant's argument that Amendment 591 should have resulted in a lower sentencing Guidelines range. (See dkt. no. 150 at 2-3.) As this Court explained, it arrived at the offense level of 43—which is the offense level for murder under U.S.S.G. § 2A1.1(a)—through applicable cross-references in the Guidelines related to the offenses of Defendant's conviction, consistent with Amendment 591. (See id.) The Court of Appeals agreed, (see dkt. no. 167), and Defendant raises no basis to reconsider that decision.

11

The cases Defendant cites also fail to support his assertion that he received an unduly long sentence, much less that he received a sentence so unreasonably long that it qualifies as an extraordinary and compelling reason for release. Defendant identifies several cases in which defendants committed crimes involving murder and drug trafficking and received sentences, or sentencing reductions, that resulted in twenty to thirty years incarceration. (See Mot. at 21-22.) Here, Defendant murdered three people and attempted to murder a fourth, whereas nearly all the cases he cites involved only one murder. Of course, sentencing requires this Court to consider numerous factors unique to the particular defendant and the particular case. But the sheer amount of harm Mungin inflicted means, at a minimum, a longer sentence is not unreasonable, much less an extraordinary and compelling reason for early release.[1]

---

[1] Many of the early-release cases Defendant cites also involved "extraordinary and compelling" circumstances for release that are not present in Defendant's case. See, e.g., United States v. Tidwell, 476 F. Supp. 3d 66, 68 (E.D. Pa. 2020) (noting defendant was "terminally ill" with a "life expectancy of less than a year"); United States v. Perez, 2021 WL 837425, at *4-5 (D. Conn. Mar. 4, 2021) (noting that the Government did not dispute the defendant's severe medical condition placed him at risk of suffering severe effects from COVID-19 and that "two former Assistant United States Attorneys who prosecuted Defendant's case wrote an unsolicited letter" in support of a reduction); United States v. Ramsay, 538 F. Supp. 3d 407, 424 (S.D.N.Y. 2021) (relying on fact defendant was eighteen years old and lacked fully developed cognitive ability at time of crime).

Finally, Defendant's claim that he has been rehabilitated does not warrant early release. It is true that Defendant has not had violent incidents in prison and appears to have made good use of programming available to him. But given Defendant's history of extreme violence as an adult, over an extended period of time, his activities in prison do not present an "extraordinary and compelling" reason for release, particularly in the absence of other persuasive factors.

B. The Section 3553(a) Factors Require Denying Defendant's Motion

As this Court found in denying Defendant's prior motion, even if there were compelling reasons for a sentence reduction, "the danger to the community that he poses and the need to punish him for his offenses counsel against release." (Dkt. no. 261 at 10.) In terms of danger to the community, Defendant "was, quite simply, a paid killer who committed three murders and attempted a fourth," all on public streets where bystanders were in imminent danger and at least three were seriously harmed. (Id.) "Release of a Defendant who has demonstrated such a callous disregard for human life would put the community at risk." (Id.) As for the "need for punishment," Defendant's "guidelines range was life imprisonment," and he received a statutory maximum sentence of 40 years imprisonment. (Id.) He still has approximately eight years of that sentence to

serve, and the "heinous" nature of his crimes "requires that he serve it." (Id.) Nothing has changed.

### IV. Conclusion

For the reasons set out above, Defendant's second motion for compassionate release, (see dkt. no. 318), is denied.

The Clerk of the Court shall close docket entry number 318 and shall mail a copy of this order to Defendant.

**SO ORDERED.**

Dated:   New York, New York
         June 3, 2024

*Loretta A. Preska*
_____
LORETTA A. PRESKA
Senior United States District Judge